ORIGINAL

E-filing

1  Business Affairs Consultants Inc. ALC
   Christopher P. Epsha (SBN 202089)
2  1800 Century Park East Suite 600
   Los Angeles, California 90067
3  Tel:  310-229-5921
   Fax:  888-779-6561
4

5  Attorneys for Plaintiffs
   ERNESTO S. PURUGANAN and
6  ISABELITA G. PURUGANAN

7

FILED
OCT - 4 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

8          IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

C12-5168

ADR EDL

12  ERNESTO S. PURUGANAN and            )  Case No.:
    ISABELITA G. PURUGANAN              )
13                                      )  VERIFIED COMPLAINT
            Plaintiffs,                 )
14                                      )     1. Wrongful Foreclosure
                                        )     2. Quiet Title
15          v.                          )     3. Fraud
                                        )     4. Cancellation of Instruments
16  HSBC BANK USA, NATIONAL             )     5. Violation of Bus. & Profs. Code,
    ASSOCIATION as Trustee for ACE      )        Section 1700, *et seq.*
17  SECURITIES CORP. HOME EQUITY        )     6. Unjust Enrichment
    LOAN TRUST, SERIES 2005-HE7, ASSET  )     7. Slander of Title
18  BACKED PASS-THROUGH                 )     8. Violation of CA. Civ. Code Section
    CERTIFICATES; MORTGAGE              )        2932.5
19  ELECTRONIC REGISTRATION SYSTEMS,    )
    INC and DOES 1 through 100, inclusive )
20                                      )
            Defendant(s).               )  JURY TRIAL DEMANDED
21                                      )
                                        )
22                                      )

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

BY FAX

**INTRODUCTION**

1

2      ERNESTO S. PURUGANAN and ISABELITA G. PURUGANAN sue HSBC BANK USA,

3   NATIONAL ASSOCIATION ("HSBC") as Trustee for ACE SECURITIES CORP. HOME

4   EQUITY LOAN TRUST, SERIES 2005-HE7, ASSET BACKED PASS-THROUGH

5   CERTIFICATES ("ACE SECURITIES CORP. HOME EQUITY LOAN TRUST 2005-HE7" or

6   "MBS Trust") in its capacity as trustee for the mortgage-backed securities trust, and MORTGAGE

7   ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") for wrongful foreclosure, in order to

8   quiet title to their real property, for fraud, cancellation of instruments, slander of title and for

9   violation of the California Business & Professions Code, Section 17200 *et seq.* and California Civil

10  Code Section 2932.5. Plaintiffs also seek to enjoin a trustee sale of their property scheduled for

11  **October 11, 2012** and restitution for mortgage payments, fees and costs improperly collected from

12  them by Defendant HSBC.

13      Plaintiffs allege that Defendants are third-party strangers to their mortgage loan and have no

14  ownership interest entitling them, or their agents, to collect payments, declare a default or exercise a

15  power of sale of a deed of trust.  By hiding behind the complexities of the mortgage finance system,

16  Defendants brazenly attempt to dupe Plaintiffs (and millions of other American homeowners) into

17  believing that they have the right to collect on a debt in which none of them has an ownership

18  interest. In an attempt to further their fraudulent scheme and create the air of propriety surrounding

19  their debt collection efforts, Defendants have resorted to "papering the file" by fabricating a

20  "Corporate Assignment of Deed of Trust," and filing foreclosure documents which substantially

21  violate provisions of California's non-judicial foreclosure statute. The defective foreclosure

22  documents are fatal to Defendants attempt to take Plaintiffs' property without any authority

23  whatever to do so. As non-judicial foreclosure is a draconian result, strict compliance with the

24  provisions of the statute is mandatory. *Miller v. Cote* (1982) 127 Cal. App. 3d 888, 894 (a trustee

25  sale based on a statutorily deficient Notice of Default is invalid).

26

27

28

1    Not only is Defendants' conduct a criminal violation of California's Mortgage Fraud Statute,

2    Cal. Penal Code §532(f)(a)(4)[1], and an affront to long-standing real property laws, their reliance on

3    fabricated and possibly forged documents undermines the integrity of the judicial system. Through

4    this action, Plaintiffs seek to stop Defendants' fraudulent practices, quiet title to their property in

5    their names based on the irrefutable fact that no defendant to this action has any beneficial or other

6    interest in their mortgage loan and restitution of mortgage payments collected by the defendants

7    when they know they are not entitled to this money.

8    None of the defendants named to this action is a beneficiary or real party in interest under

9    Plaintiff's NOTE having the power to exercise the power of sale pursuant to its accompanying Deed

10   of Trust ("DOT"). Plaintiffs contend that their mortgage loan has become unsecured and that,

11   consequently, no real party in interest exists with the power to collect mortgage payments from them

12   or to exercise the power of sale under the DOT. Plaintiffs do not dispute that they agreed to repay a

13   loan evidenced by a DOT. Plaintiffs dispute the amount owed, and seek the Court's assistance in

14   determining to whom, if anyone, the amount allegedly is owed under the NOTE. It is most certainly

15   not the defendants herein. Plaintiffs also allege that any amount owed is subject to equitable offset

16   by actual, consequential, special and punitive damages owed to Plaintiffs by the Defendants.[2]

17   This unfortunate situation arises from the fact that Plaintiffs' mortgage loan was contributed to

18   the MBS Trust for which Defendant HSBC serves as trustee. However, as California statutory

19   requirements and prescribed rules governing the trust were violated leaving HSBC without any legal

20   or equitable interest in Plaintiffs' mortgage. Defendants tried to cover up their failure to effectively

21   document the sale of Plaintiff's NOTE by fraudulently attempting to assign Plaintiffs' Deed of Trust

22   to HSBC six years after the loan already had been sold to the MBS Trust. There now exists a cloud

23   on Plaintiffs' title to their property which renders it unalienable. Further, Plaintiffs have been

24   ─────────────────

25   [1] Cal. Penal Code §532(f)(a) provides that "a person commits mortgage fraud if, with the intent to defraud, the person does any of the following ... (4) files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omissions."

26

27   [2] However, simply because Plaintiffs do not dispute this fact, the Court should not condone Defendants' fraudulent and predatory mortgage servicing and foreclosure practices and allow them to collect on money they were not owed. Simply put, the Court should not allow HSBC and MERS to run roughshod over centuries of well-settled property laws just because Plaintiffs "owe somebody the money."

28

1    fraudulently induced to pay mortgage payments to ASC and its predecessors on behalf of Defendant

2    HSBC which are and were parties without authority to collect them.  Consequently, Plaintiffs seek

3    the Court's intervention to quiet title to their real property in their name and to disgorge the ill-

4    gotten gains obtained by Defendant HSBC at Plaintiffs' expense.

5    **A.  PARTIES AND JURISDICTION**

6         1.   Plaintiffs Ernesto S. Puruganan and Isabelita G. Puruganan ("Plaintiffs") at all  times

7    material hereto are and were the owners of the Subject Property of the action, which is located at

8    1832 Sunnyvale Ave., Walnut Creek, California 94597 (the "Property").

9         2.   America's Servicing Company ("ASC") is a division of Wells Fargo Home

10   Mortgage that services loans for other investors under the "ASC" name.  The vast majority of ASC

11   mortgages were originated by other lenders, packaged into securities, and sold by those lenders into

12   the secondary market.

13        3.   Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is organized and

14   existing under the laws of the State of Delaware with corporate headquarters located at 1818 Library

15   Street, Reston, VA  20190.  MERS tracks the ownership interests and servicing rights in mortgage

16   loans and holds title to mortgages solely as a nominee for the banks which subscribe to its services

17   and who are the true beneficial owners of the mortgage loans.

18        4.   Defendant HSBC Bank USA, National Association ("HSBC"), the American subsidiary

19   of UK based HSBC Holdings, is a national bank with  headquarters located at 452 5th Avenue, New

20   York, N.Y.  10018. HSBC's national charter lists its main office as located in McLean, Virginia.

21   HSBC is sued solely in its capacity as trustee of the above-captioned MBS Trust.

22        5.   Northwest Trustee Services, Inc. ("NORTHWEST") provides foreclosure services to its

23   banking clients.

24        6.   WMC Mortgage Corporation ("WMC") was a wholesale originator of subprime

25   residential mortgages owned by GE Money (formerly GE Consumer Finance).  GE ceased WHM's

26   operations in 2007.

27        7.   Wells Fargo Bank, N.A. ("WELLS FARGO") is a national bank and the original

28   servicer of Plaintiffs' mortgage loan. Wells Fargo is the current servicer for the MBS Trust for

1    which HSBC serves as trustee.

2        8.     Plaintiffs are ignorant of the true names and capacities of Defendants sued under

3    fictitious names Does 1-100, inclusive.  Plaintiffs will amend this Complaint to allege such names

4    and capacities as soon as they are ascertained.  Plaintiffs are informed and believe, and thereon

5    allege, that each of said fictitiously named Defendants is responsible in some manner for the acts

6    complained of herein.

7        9.     This Court has jurisdiction of this action as the residential real property which is

8    the subject of this action is situated in Contra Costa County, California and the acts complained of

9    occurred in Walnut Creek, California.

10       10.   The amount in controversy exceeds $75,000 and, on information and belief, there

11    exists complete diversity of the parties hereto pursuant to28 U.S.C. 1332(a)(1).

12    **B. MATERIAL FACTS COMMON TO ALL COUNTS**

13       11.   Plaintiffs executed a mortgage loan consisting of a Deed of Trust ("DOT") and

14    Adjustable Rate Note and Rider ("NOTE") on August 10, 2005.  The DOT was recorded on August

15    19, 2005. A true and correct copy of the DOT and Adjustable Rate Rider are attached hereto as

16    **Exhibit "A"**, and are incorporated by reference  as though fully set forth herein. The original lender

17    was WMC Mortgage Corporation and MERS was its nominal beneficiary.  Westwood Associates

18    ("WESTWOOD") is identified in the DOT as trustee.  The original servicer of Plaintiffs' loan was

19    WELLS FARGO.

20       12.   On information and belief, WMC  was merely a table lender and Plaintiffs loan was

21    sold either simultaneously with the Closing of Plaintiffs' loan, or shortly thereafter, to the ACE

22    Securities Corp. Home Equity Loan Trust, Series 2005-HE7 ("MBS Trust").  Plaintiffs' loan was

23    sold to the MBS Trust before the November 28, 2005 closing Date of this MBS Trust and assigned

24    Trust Loan Id. No. 0110899198.  Defendant HSBC serves as trustee of the MBS Trust.

25       13.   Participants in the Trust are:

26           a.    Originator:  WMC Mortgage Corporation

27           b.    Seller/sponsor:  DB Structured Products, Inc.

28           c.    Depositor:  ACE Securities Corporation.

1          d.  Custodian:  Wells Fargo Bank, N.A.

2          e.  Trustee:  HSBC Bank USA, National Association

3          f.  Trust Servicer:  Wells Fargo Bank, N.A.

4          14.  The Pooling and Servicing Agreement ("PSA") that governs  administration of the

5    Trust mandates a chain of assignment protocol in order to perfect title to each mortgage loan

6    contributed to the MBS Trust and to preserve the MBS Trust's favorable pass-through tax treatment.

7    Specifically, the loan must be assigned from the Originator, here WMC, to Seller/Sponsor DB

8    Structured Products, then from Seller/Sponsor DB to Depositor ACE Securities and, finally, from

9    ACE to Trustee HSBC. The prescribed assignments were required to be completed in the specified

10   order by November 28, 2005, the Closing Date of this MBS Trust. The PSA consists of 195 pages

11   and is available on the SEC's website at http://www.secinfo.com/dqTm6.vt.d.htm.  As stated with

12   more particularity, *infra*, the mandatory chain of title protocol was not followed.

13         15. .Within the last few years, due to the collapse of the California housing market,

14   Plaintiffs' property has lost substantial value and is currently significantly underwater. A year ago,

15   Plaintiffs hired a company to handle loan modification discussions on their behalf.  They have been

16   required to submit the same financial information to their negotiator numerous times.  Loan

17   modification discussions, while still in process, have gone nowhere. Despite the fact Plaintiffs are in

18   loan modification negotiations, their property is scheduled to be sold at a trustee's sale on **October**

19   **11, 2012.**[3]

20         16.  On May 17, 2011, a Notice of Default and Election to Sell Under Deed of Trust

21   ('NOD") was filed against Plaintiffs by LSI Title Company as agent for NORTHWEST.

22   NORTHWEST purportedly was acting on behalf of an unidentified beneficiary.  However, the NOD

23   states the following:

24   / / /

25   / / /

26

27   [3]  Dual-tracking, that is, pursuing loan modification negotiations and foreclosure activity simultaneously, has been
     banned by the Office of the Comptroller of the Currency and outlawed by the California Homeowners Bill of Rights Act
28   which was signed into law on July 11, 2012.

---

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

HSBC Bank USA, National Association, as Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2005-HE7, Asset Backed Pass-Through Certificates
c/o Northwest Trustee Services, Inc.
1241 E. Dyer Road, Suite 250, Santa Ana, CA 92705

The information contained in the NOD evidences that Plaintiffs' loan was sold to the ACE Securities Corp. Home Equity Loan Trust, Series 2005-HE-7 for which Defendant HSBC serves as Trustee. The NOD also shows that HSBC claims a beneficial interest in Plaintiffs' loan purportedly entitling it to enforce Plaintiffs' mortgage and to collect mortgage payments from them. A true and correct copy of the NOD is attached hereto as **Exhibit "B"** and incorporated by reference as though fully set forth herein.

17. On August 22, 2011, Defendant MERS, as nominee for WMC, executed a Corporate Assignment of Deed of Trust to HSBC Bank USA National Association as Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2005-HE7 Asset Backed Pass-Through Certificates. The Assignment was recorded in the Contra Costa Recorder's Office on August 24, 2011. A true and correct copy of the Corporate Assignment of Deed of Trust is attached hereto as **Exhibit "C"** and incorporated by reference as though fully set forth herein.

18. The Assignment is clearly fraudulent as HSBC claimed a beneficial interest in Plaintiffs' mortgage loan in the NOD *which was issued three months before the Corporate Assignment was executed.* The document is a sham for the additional reason that MERS' agreements with its member lenders makes clear that MERS' relationship with its members is an agency relationship. MERS, as nominee, has very limited authority and can only act at the direction of its lender principal. In this case WMC was MERS' principle. But WMC had been defunct for four years before MERS issued the Corporate Assignment.[4] As MERS could not have been acting at WMC's direction in 2011 when it executed and recorded the Corporate Assignment of Deed of Trust, its attempt to assign the

---

[4] Specifically, WMC was a wholesale originator of subprime residential mortgages owned by GE Money (formerly GE consumer Finance). GE ceased WMC's operations in 2007, upon the collapse of the subprime mortgage market.

1  beneficial interest in Plaintiffs' loan to HSBC is an *ulta vires* act that is a violation of Cal. Penal

2  Code §532(f)(a)(4).  Consequently, the Corporate Assignment is void and without legal force or

3  effect.

4      19.   The NOD recorded three months before the fraudulent attempt to assign WMC's

5  interest in Plaintiffs' mortgage loan is, likewise, fraudulent and void. Section 2924 (a)(1) of the non-

6  judicial foreclosure statute provides that an NOD may only be issued by a mortgagee, trustee,

7  beneficiary or any of their authorized agents.  The NOD could not have been issued by, or on behalf

8  of, WMC as it did not exist in 2011.  Similarly, the NOD was not issued by Westwood Associates,

9  the trustee under the DOT when the document was issued.  Finally, no attempt to assign the

10  beneficial interest in Plaintiffs' loan to HSBC as trustee for the MBS Trust was attempted until

11  August, 2011 - three months after the NOD was issued. Therefore, the NOD was not issued by a

12  beneficiary in violation of Section 2924 (a)(1).  The NOD was therefore knowingly issued in

13  violation of Section 2924(a)(1) and is void. The act of recording this fraudulent document also

14  constitutes actionable criminal fraud and a felony.[5]

15      20.  On October 5, 2011, WELLS FARGO as servicing agent for HSBC Bank USA,

16  National Association, as Trustee for the ACE Securities Corp. Home Equity Loan Trust, Series

17  2005-HE7, executed a Substitution of Trustee attempting to substitute Northwest Trustee Services,

18  Inc. for Westwood Associates, as trustee under Plaintiffs' DOT. The document was recorded on

19  October 24, 2011. A true and correct copy of the Substitution of Trustee is attached hereto as

20  **Exhibit "D"** and incorporated by reference as though fully set forth herein.

21      21.  As both the NOD and Corporate Assignment of Deed of Trust to HSBC are void, the

22  Substitution of Trustee is similarly void and of no legal force and effect. Execution of the

23  Substitution of Trustee also violates §2934 (a)(1)(A) of the non-judicial foreclosure statute which

24  requires that all beneficiaries must acknowledge and record the Substitution. Here, Defendant

25  HSBC is not a valid beneficiary and the Defendants are well aware of that fact. Defendants'

---

[5] California Penal Code §115 provides that: Any person who knowingly procures or offer any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine might be filed, registered or recorded under any law of this state or of the United States, is guilty of a felony. *See also* Cal. Penal Code Section 532(f)(a)(4), *supra*, at n.1.

1   violations of California's non-judicial foreclosure statute are not mere procedural irregularities.

2   They constitute blatant and deliberate acts of fraud.

3        22. On October 24, 2011, Northwest Trustee Services, Inc. recorded a Notice of Trustee

4   Sale ("NOTS") scheduling the foreclosure sale of Plaintiffs' property for November 18, 2011. The

5   sale was postponed numerous times and is now scheduled for October 11, 2012. A true and correct

6   copy of the NOTS is attached hereto as **Exhibit "E"** and incorporated by reference as though fully

7   set forth herein. As the NOTS flows from the illegal and void Corporate Assignment of Deed of

8   Trust and the illegal and void NOD and Substitution of Trustee, it, too, is void.

9        23. A chain of title review in the Contra Costa Recorder's Office conducted on June 7, 2012

10  revealed that no assignment of Plaintiffs' mortgage was ever made by WMC to any entity until the

11  illegal assignment to HSBC as trustee for the MBS Trust in August, 2011 - six years after: (i) WMC

12  sold the loan without documenting such sale and (ii) the MBS Trust closed and was prohibited from

13  accepting further contributions of mortgage loans to the MBS Trust.[6] Theses failures rendered

14  Defendant HSBC without any legal or equitable beneficial interest in Plaintiffs' mortgage and

15  without authority to enforce the terms of the mortgage or to collect mortgage payments from the

16  Plaintiffs.

17       24. In fact ASC presumably as agent for HSBC, demanded and collected mortgage

18  payments from Plaintiffs without authority to do so. Defendant HSBC thus has been unjustly

19  enriched, and must be required to restore their ill-gotten gains to the Plaintiffs.

20       25. The fraudulent Corporate Assignment of Plaintiff's DOT was a clumsy attempt to paper

21  over and cover up the failure to document the sale of Plaintiffs' mortgage loan. For example, at the

22  time the 2011 Assignment was attempted, Plaintiffs' loan was non-performing. Why would HSBC

23  purchase a non-performing loan which purchase violates the terms of the governing PSA? The only

24  reasonable explanation is that in order to initiate foreclosure proceedings against Plaintiffs, HSBC

25  needed to obscure the fact that it was never assigned Plaintiff's loan thought the undocumented 2005

26  sale by filing a belated, fraudulent Corporate Assignment in 2011. Although Defendants have

27

28      [6] See PSA at p. 146 at paragraph (i).  http://www.secinfo.com/dqTm6.vt.d.htm.

*Puruganan v. America's Servicing Company, et al.*       Verified Complaint       9

1   demonstrated that they believe that they are above the law, in reality, they are bound to strictly

2   adhere to the provisions of California's non-judicial foreclosure statute which provides the only

3   procedural safeguards available to struggling homeowners. Plaintiffs' constitutional due process

4   rights have been violated and these violations must be redressed.

5   **C. CAUSES OF ACTION**

6   **COUNT I:  WRONGFUL FORECLOSURE**
    **(Against All Defendants)**

7

8       26. Plaintiffs refer to and incorporate by this reference the allegations contained in the

9   foregoing paragraphs as though set forth fully herein.

10       27. A trustee is an agent of the beneficiary of a mortgage loan and unlawful conduct of

11   the trustee may be imputed to the principal beneficiary. A trustee has a duty not to conduct an

12   illegal, fraudulent or willfully oppressive sale of property under a power of sale contained in a deed

13   of trust.

14       28. A trustee is also liable to a trustor or mortgagor in California upon the basic principle

15   of tort liability enunciated in Civil Code §1708 that every person is bound by law not to injure the

16   person or property of another or infringe on any of his rights. *See also Munger  v. Moore* (1970) 11

17   Cal. App. 3d 1, 7-8. Defendant NORTHWEST breached its duty of care to Plaintiffs by initiating

18   foreclosure proceedings against the Plaintiffs based on an illegal and knowingly fraudulent

19   assignment of Plaintiffs' DOT by Defendants MERS and HSBC and knowingly fraudulent

20   foreclosure documents filed by WELLS FARGO, and NORTHWEST at the behest of its principal

21   (whether MERS or HSBC) that also violate the requirements of California's non-judicial foreclosure

22   statute.

23       29.  Either simultaneously with the Closing on Plaintiffs' loan, or shortly thereafter,

24   WMC, the original lender, transferred all beneficial interest in the loan to a private investor when

25   WMC sold Plaintiff's NOTE.  This transfer was done without a duly acknowledged instrument

26   recorded in the Contra Costa Recorder's Office as required by the non-judicial foreclosure statute.

27   Cal. Civ. Code §2932.5; *see also In Re Salazar*,448 B.R.814 (2011).

28       30. When this undocumented transfer occurred, neither WMC (original lender), WELLS

1    FARGO (original servicer), MERS (as nominal beneficiary), WESTWOOD (original trustee), ASC

2    (current servicer), or NORTHWEST (substituted trustee) recorded a transfer of the beneficial

3    interest in Plaintiff's NOTE to HSBC (as trustee for the MBS Trust).  ¶¶12, 22-25 *supra*.

4         31. In August 2011, **over six years subsequent to the above transfer**, Defendants

5    attempted to "paper over" the earlier lack of loan sale documentation by recording the fraudulent,

6    possibly forged Corporation Assignment of Deed of Trust by an employee of WELLS FARGO who

7    falsely claimed to be an Assistant Secretary of MERS.  *See* **Exhibit "C"**.

8         32. **Exhibit "C"** is the only evidence that HSBC (as purported trustee for the purported

9    NOTE owner MBS Trust) has a beneficial interest in the NOTE and DOT.  This criminally

10   fraudulent evidence amounts to no evidence of a legally effective transfer.  HSBC is therefore not a

11   real party in interest that has standing to exercise the DOT's power of sale because it is neither the

12   owner of the NOTE, holder of the NOTE nor a beneficiary under the NOTE.

13        33. A power of sale is conferred by the mortgage under Cal. Civ. Code §2924.

14   According to Plaintiffs' DOT, the "Lender" is WMC, and the "Trustee" is WESTWOOD.  Under

15   Para. 22 of the DOT, only the lender has the power to accelerate the loan:

16        Lender shall give notice to Borrower prior to acceleration following Borrower's
         breach of any covenant of agreement in this Security Instrument…
17       If Lender invokes the power of sale, Lender shall execute or cause Trustee to
18       execute a written notice of the occurrence of an event of default and of Lender's
         election to cause the Property to be sold. Trustee shall cause this notice to be
19       recorded in each county in which any part of the Property is located.
         (**Exhibit "A"** at ¶22).
20

21   *See also* Adjustable Rate Rider, **Exhibit "A"**, Section B-Transfer of the Property or a Beneficial

22   Interest in Borrower (giving the Lender the power to accelerate the loan).

23

24        34. WMC remained the Lender for but a few short days or months until it sold the loan to

25   the MBS Trust before the Trust's closing date of November 28, 2005.  Thereafter, because WMC no

26   longer had an interest in the loan, WMC could not in 2011 invoke a power of sale, issue a notice of

27   default and the lender's election to cause the Subject Property to be sold.  WMC could not invoke

28   the power of sale for the additional reason that it did not exist as a business entity in 2011.

35. No Defendant is a lender or a Note Holder. No Defendant has admissible evidence that it has any interest in the loan, NOTE or DOT to invoke a power of sale, issue a notice of an event of default or to elect to cause the Subject Property to be sold.

36. In initiating the aforementioned illegal and fraudulent foreclosure proceedings, NORTHWEST, on behalf of its principal HSBC, which had not been assigned any beneficial interest in Plaintiffs' loan when the NOD was issued, has acted with willful oppressiveness and malice toward the Plaintiffs.

37. Plaintiffs have suffered damages proximately caused by the illegal and fraudulent foreclosure activities against them by HSBC and MERs and their agents including, but not limited to, the imminent loss of their real property, the loss of their elder care business, mortgage payments paid to ASC and its predecessors on behalf of HSBC which had no authority to collect such payments, increased costs and fees assessed against them associated with the wrongful foreclosure, payments made to a loan modification assistance firm, a forensic mortgage loan auditor, their attorneys of record in this case and damage to their credit. Plaintiffs are suffering severe emotional distress as a result of the harm they have suffered and because they are extremely concerned about the welfare of their elderly clients who will be evicted and displaced should their property be sold in foreclosure. Plaintiffs are also entitled to and seek punitive damages against MERS and HSBC as a result of the illegal, fraudulent and willfully oppressive foreclosure activities against Plaintiffs authorized and engaged in by these defendants.

38. Plaintiffs are not required to allege tender to maintain their cause of action for wrongful foreclosure. In fact, requiring tender is wholly improper under the circumstances of this case. Plaintiffs do not allege irregularities in the foreclosure process. Instead, they allege that neither of the Defendants nor any of their agents is a real party in interest having standing to foreclose on their property. Under these facts, Plaintiffs have no obligation to tender "any money at all to any defendant". *Frazier v. Aegis Wholesale Corp.,* et al., No. C-11-4850 EMC (N.D. Cal. Dec. 16, 2011) at 4. Moreover, where as here, the impending foreclosure is void and not voidable, tender is not required. *Tamburri v. Suntrust Mortgage, et al.,* No. C-11-2899 EMC, 2011 WL 6294472 at *4 (N.D. Cal. Dec. 15, 2011); *Dimrock v. Emerald Properties,* (2000) 81 Cal. App. 4th

686, 678. In addition, the tender rule applies only in cases seeking to set aside a completed sale, rather than an action seeking to prevent a sale in the first place. *See, e.g., Vissuet v. Indymac Mortg. Services*, No. 09-CV-2321-IEG (CAB), 2010 WL 1031013 at *2 (S. D. Cal. March 19, 2010). Finally, Plaintiffs allege herein that any arrearages are offset by the damages suffered by Plaintiffs caused by defendants' illegal and fraudulent activity. For this addition reason, Plaintiffs are not required to allege tender.

**WHEREFORE, Plaintiffs pray for judgment against the Defendants as hereinafter set forth.**

### COUNT II: QUIET TITLE
### (Against HSBC and DOES 1-100)

39. Plaintiffs incorporate the preceding paragraphs by reference as though fully set forth herein.

40. Plaintiffs are, and at all times herein mentioned were, the owners and/or entitled to exclusive possession of the real property located at 1832 Sunnyvale Ave., Walnut Creek, Contra Costa County, California 945197, APN: 170-260-028-7. A true and correct copy of the legal description of the Property is attached as the last page of **Exhibit "A"** to this Verified Complaint.

41. Plaintiffs seek to quiet title against the claims of Defendant HSBC and all persons, known and unknown, claiming any legal or equitable right, title, estate, lien, or adverse interest in the Subject Property as of the date the Complaint was filed (Cal. Code Civ. Proc. §760.020).

42. WMC sold Plaintiffs' NOTE to the MBS Trust. Plaintiffs are informed and believe that this former, lawful beneficiary has been paid in full.

The DOT states in ¶23:

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it...

(**Exhibit "A"** at ¶23). The DOT does not state that Plaintiffs must pay all sums, only that all secured sums must be paid. Upon information and belief, Plaintiffs allege that the obligations

1    owed to WMC under the DOT and NOTE were fulfilled and the loan was fully paid when WMC

2    received funds in excess of the balance on the NOTE as proceeds of sale through the sale of the

3    loan and insurance proceeds from Credit Default Swaps.

4              43. Defendant HSBC's claims are adverse to Plaintiffs because Plaintiffs are informed

5     and believe that HSBC is not a holder of the NOTE, cannot prove any interest in the NOTE or that

6     the NOTE is secured by the DOT, as well as for the reasons set forth in the causes of action *supra*

7     and *infra*. As such, HSBC has no right, title, lien, or interest in the Subject Property.

8              44. Plaintiffs therefore seek a declaration that the title to the subject property is vested in

9     Plaintiffs alone, free and clear of encumbrances in favor of HSBC and DOES 1-100 and that HSBC

10    and DOES 1-100 be declared to have no estate, right, title, lien or interest in the subject property and

11    that this Defendant and DOES 1-100 be forever enjoined from asserting any estate, right, title, lien

12    or interest in the Subject Property adverse to Plaintiffs herein.  Plaintiffs seek an order from this

13    Court instructing the clerk of the court to execute in recordable form a deed of reconveyance to

14    Plaintiffs' Property.

15         **WHEREFORE, Plaintiffs pray for judgment against the Defendants as hereinafter set**

16    **forth.**

17                             **COUNT III:  FRAUD**
                              **(Against HSBC and MERS)**
18

19         45. Plaintiffs refer to and incorporate by this reference the allegations contained in the

      foregoing paragraphs as though set forth fully herein.
20

21         46. Plaintiffs are informed and believe that WMC pre-sold Plaintiffs' mortgage to the

22    MBS Trust for which HSBC serves as trustee. Within hours or a few months after Plaintiffs signed

      the NOTE, WMC sold all of its interest in the NOTE for value to DB Structured Products, Inc.,
23

24    Sponsor of the MBS Trust, which bundled Plaintiffs' NOTE with numerous other residential

      mortgages into residential mortgage-backed securities ("MBS") which were structured into synthetic
25

26    collateralized debt obligations ("CDOs") and sold to investors in the MBS Trust, *i.e.*, ACE

27    Securities Corp. Home Equity Loan Trust, Series 2005-HE7.  Plaintiffs' mortgage loan is listed in

      the MBS Trust's Mortgage Loan Schedule under Trust Loan No. 0110899198.  As of the closing
28

1    date of the Trust, there were 9,000 loans in the pool which had a principal balance in the amount of

2    $1,737,391,000. *See* Prospectus Supplement, dated November 23, 2005. The Prospectus

3    Supplement consists of 281 pages and can be found online at:

4    http://www.secinfo.com/dScj2.z7m4.htm. Plaintiffs are informed and believe that the Trust's

5    Sponsor intended to short the Portfolio it helped to select by entering into credit default swaps to

6    buy protection against the certain event that the promissory notes would default. On information

7    and belief, Defendants expected that Plaintiffs would not have the ability to repay the loan. It was

8    not a matter of being unconcerned with the possible outcome that Plaintiffs would default;

9    Defendants expected they would default.

10          47.  Defendants failed to disclose to Plaintiffs that their economic interests were adverse

11   to those of Plaintiffs and that Defendants expected to profit when Plaintiffs found it impossible to

12   perform and defaulted on their mortgage.

13          48. A necessary element in the formation of an enforceable contract under the common

14   Law is a *meeting of the minds*. Two or more parties must share some expectation that a future event

15   will occur. Plaintiffs expected that they would borrow money from WMC, they would pay it back,

16   and then they would own the Property. WMC expected that Plaintiffs would borrow money, they

17   would not be able to pay it back and not be paid back itself by borrowers. Then, other participants

18   in this scheme or the certificate holders of the MBS Trust would own the Subject Property. Since

19   there was no shared expectation—no meeting of the minds—no contract could have been formed

20   between Plaintiffs and WMC. WMC's successors in interest, Defendants herein, are seeking to

21   enforce this contract.

22          49.  In addition to WMC's and Defendants' expectation that Plaintiffs would lose title

23   to the Subject Property through foreclosure, WMC anticipated transferring the NOTE to investors

24   immediately after Plaintiffs signed the NOTE. Plaintiffs are informed and believe that Defendants

25   purchased credit default insurance so that Defendants would receive the balance on the NOTE if and

26   when Plaintiffs defaulted, in addition to any money WMC and Defendants received when they sold

27   the NOTE. Not only did WMC and others dispense with conventional underwriting practices in

28   2005, they also paid premium fees and other incentives to mortgage brokers who signed up the

1  riskiest borrowers. Fueled by spiraling profits to bankers, common law principles of contract

2  formation, customary underwriting practices, and statutory procedures for transferring interests in

3  real property, including the recordation of transfers of interests in real property, disintegrated and the

4  system collapsed.

5      50. Defendant HSBC's agents WELLS FARGO, servicer for the MBS Trust and ASC

6  (owned by WELLS FARGO), the current servicer of Plaintiffs' mortgage, expected that Plaintiffs

7  would not perform as merely two victims in a scheme in which: (i) Defendant HSBC's fees

8  collected by its servicers would be greater as the number of loans increased; (ii) Defendant HSBC's

9  fees collected by its servicers would be greater as the balances of loans increased; (iii) Defendant

10  HSBC would recover the unpaid balance of Plaintiffs' loan through credit default insurance when

11  Plaintiffs inevitably defaulted; and (iv) all risk of loss in the event of Plaintiffs' default would be

12  borne by investors, not WELLS FARGO (or ASC) as the servicers or HSBC as trustee for the MBS

13  Trust.

14      51.  Plaintiffs' participation in the mortgage contract was procured by overt and covert

15  misrepresentations and nondisclosures. The parties did not share a single expectation with respect to

16  any of the terms of the mortgage contract and therefore the contract was void *ab initio*.  No

17  enforceable contract was formed between Plaintiffs and WMC, so their DOT and NOTE were not

18  assets of the MBS Trust.  WELLS FARGO (ASC) had no right to receive payments under Plaintiff's

19  mortgage loan on behalf of HSBC and no Defendant has a right to foreclose on the Subject Property.

20  Plaintiffs do not seek rescission of the contract. They allege that the contract was void *ab initio*.

21      52. Plaintiffs were first alerted that their NOTE and DOT may have been sold without

22  documentation for the first time during June 2012 when they attended a conference for owners of

23  elder care facilities held in Nevada.  There they met a woman with whom they had a discussion

24  about the housing crisis.  The woman tried to explain to Plaintiffs the reasons for the collapse of the

25  housing market. However, Plaintiffs found it difficult to grasp this complicated subject. The woman

26  suggested that Plaintiffs contact a loan auditor expert she knew to find out if their mortgage loan had

27  been sold without documentation.

28      53. Shortly after the conference, Plaintiffs hired the loan auditor expert to perform a

1 | forensic audit of their mortgage loan. The auditor asked Plaintiffs to copy records in the Contra

2 | Costa Recorder's Office related to their mortgage loan. Plaintiff Ernesto Puruganan retrieved the

3 | requested documents and gave them to the auditor. The auditor prepared a report of his audit dated

4 | August 17, 2012 and Plaintiffs received the report shortly thereafter. At the end of August, 2012

5 | Plaintiffs retained the services of legal counsel to review the auditor's report, which established that

6 | their mortgage loan had, indeed, been sold without documentation, to obtain legal advice as to the

7 | extent to which they have suffered harm as a result of this undocumented sale of their loan and to

8 | determine if they had legal recourse for the harm suffered. The instant law suit is filed in October,

9 | 2012- less than two months after Plaintiffs learned that their loan had been sold without

10 | documentation. Upon reading the loan auditor's report, Plaintiffs immediately launched an

11 | investigation into possible legal action they could take to redress the harm they have suffered as a

12 | direct result of the undocumented sale of their mortgage loan.

13 |  54. Plaintiffs could not have discovered the causes of action available to redress the

14 | harm they have suffered before June 2012 because the undocumented sale of their loan was never

15 | explained to them before, during or after the closing of their mortgage loan by WMC, their lender,

16 | or by anyone else involved in the mortgage transaction. Until June 2012, Plaintiffs were not alerted

17 | to the harm these undocumented sales of loans have caused many property owners. Plaintiffs were

18 | unaware that the harm they have suffered during the past two years is attributed to the

19 | undocumented sale of their loan.

20 |  55. Defendants HSBC, MERS and their agents WELLS FARGO and ASC made

21 | misrepresentations to Plaintiffs concerning the nature of the mortgage loan transaction they were

22 | entering in that they concealed the pre-arranged undocumented sale. These defendants knew the

23 | misrepresentations were false but, nevertheless made them to induce Plaintiffs to enter into the

24 | mortgage contract. Plaintiffs justifiably relied on defendants' representation that they were entering

25 | into a traditional lender-borrower mortgage loan transaction because they never knew that their loan

26 | would be sold without documentation at the time their mortgage closed and neither WMC nor

27 | anyone involved in the mortgage transaction explained this to them.

28 |  56. Plaintiffs have suffered damages as a result of the named defendants'

1    misrepresentations. Specifically, they have lost the equity in their property due to the collapse of the

2    housing market, caused large part by the scheme of Defendants and others in their industry.

3    Plaintiffs have had to pay for the services of loan modification company, a forensic mortgage loan

4    auditor, attorneys and others to assist them in ascertaining their rights.  Plaintiffs have made

5    mortgage loan payments to ASC and its predecessors on behalf of HSBC who have no authority to

6    assess or collect such payments and face the imminent loss of their Property and elder care business.

7           57. Defendants have perpetrated a fraud on Plaintiffs by deliberately and knowingly

8    executing and filing a fraudulent assignment and fraudulent foreclosure documents. The deliberate

9    fraudulent conduct of Defendants renders each and every one of them without authority to enforce

10    the power of sale in Plaintiffs' DOT and, further, constitutes egregious violations of California's

11    non-judicial foreclosure statute.

12           58. Specifically, the following are the fraudulent documents filed by the Defendants:

13           (a)  The Notice of Default recorded on May 17, 2011 on behalf of HSBC, falsely claiming

14    to have a beneficial interest in Plaintiffs' loan and the authority to enforce its terms. The NOD is

15    signed by Aristio Singson for LSI Title Company as agent for NORTHWEST, as agent for HSBC

16    who authorized the fraudulent representations in the NOD. In fact, no attempt was make to assign

17    Plaintiffs' DOT to HSBC until August 24, 2011 - three months after the NOD was issued. Section

18    2924 (a)(1) of the non-judicial foreclosure statute provides that an NOD may only be issued by a

19    mortgagee, trustee, beneficiary or any of their authorized agents.  The NOD could not have been

20    issued by, or on behalf of, WMC as it did not exist in 2011.  Similarly, the NOD was not issued by

21    WESTWOOD, the trustee under the DOT when the document was issued.   Therefore, the NOD was

22    knowingly issued in violation of Section 2924(a)(1) and is void.

23           (b)  A Corporate Assignment of Deed of Trust recorded on August 24, 2011.  The

24    Assignment was prepared by WELLS FARGO on behalf of HSBC, its principal, and signed by Yen

25    Nguyen, one of its employees falsely claiming to be Assistant Secretary of MERS. The Corporate

26    Assignment purports to assign the beneficial interest in Plaintiffs' DOT from MERS as nominal

27    beneficiary for WMC, the original lender, to HSBC as trustee for the MBS Trust. This document is

28    fraudulent because WMC held no beneficial interest in Plaintiffs' DOT at time the assignment to

1   HSBC was attempted. WMC's interest in Plaintiffs' DOT and NOTE was extinguished in 2005

2   when there was an undocumented sale of Plaintiffs' NOTE and DOT to the MBS Trust for which

3   HSBC serves as trustee. As WMC ceased to exist as a business entity in 2007, for this additional

4   reason, MERS who can only act at the direction of WMC, its principal, acted *ultra vires* in issuing

5   the fraudulent assignment. Therefore, the Assignment is void.

6       (c)  The Substitution of Trustee recorded by WELLS FARGO as servicing agent for HSBC

7   in its capacity as trustee of the MBS Trust, is fraudulent and void because HSBC was not a valid

8   beneficiary at the time the Substitution was issued. The document is signed by Melissas Gallio, Vice

9   President, Wells Fargo Loan Documentation and was recorded on October 24, 2011. It attempted to

10  substitute NORTHWEST for WESTWOOD, the original trustee under the DOT. Under Section

11  2934(a)(1)(A) of the non-judicial foreclosure statute, only a beneficiary can acknowledge and record

12  a Substitution of Trustee. HSBC was not a valid beneficiary with authority to sanction the

13  substitution.

14      (d)  On October 24, 2011, Defendant HSBC's agent NORTHWEST issued a Notice of

15  Trustee Sale against Plaintiffs. The NOTS is signed by Melissa Myers, "authorized signatory" for

16  NORTHWEST. This document is fraudulent and void as it flows from the illegal and void

17  documents described above.

18      59. Defendants made the misrepresentations contained in the above-described documents

19  with knowledge of their falsity. The above fraudulent documents were intended to induce

20  Plaintiffs' reliance thereon in order to accomplish HSBC's goal of taking Plaintiffs' Property under

21  false pretenses and without any authority whatever to do so. Plaintiffs justifiably relied on the

22  fraudulent documents as they appeared to be genuine land records related to their mortgage loan. *See*

23  Cal. Penal Code §115. Plaintiffs have suffered damages and other harm as a result of the fraud

24  perpetrated against them via the fraudulent Corporate Assignment of Deed of Trust and fraudulent

25  foreclosure documents. Specifically, they have made mortgage payments to agents of HSBC which

26  have no authority to assess or collect them. Additionally, after more than one year of loan

27  modification negotiations, Plaintiffs still have not been able to modify the terms of their loan, and

28  therefore have been deprived of an important property right, because Defendant HSBC and the

1   investors of the MBS Trust bear no risk if Plaintiffs default on their mortgage obligation and have

2   no incentive to agree to a loan modification because of the MBS Trust is insured against these types

3   of losses.  Plaintiffs have had to make payments for more than a year to a loan modification

4   assistance company to help them (to no avail) get the requested modification.  They have paid fees

5   to their loan auditor and attorneys to uncover and address the illegal conduct of the Defendants

6   HSBC and their agents. Plaintiffs face the imminent loss of their Property and the elder care

7   business they conduct thereon.  Their creditworthiness has been significantly impaired by the illegal

8   foreclosure activity pursued by HSBC against them. Plaintiffs suffer from severe emotional distress

9   as a result of the prospect of losing their Property and business and because they worry about what

10   will happen to their elderly clients if their facility closes and their clients are evicted and displaced.

11        60. Defendants, and each of them, have acted with willful malice and oppression toward

12   Plaintiffs entitling them to an award of punitive and exemplary damages.

13        **WHEREFORE, Plaintiffs pray for judgment against the Defendants as hereinafter set**

14   **forth.**

15        **COUNT IV: <u>CANCELLATION OF INSTRUMENTS</u>**
        **(Against All Defendants)**

16

17        61. Plaintiffs refer to and incorporate herein by this reference the allegations contained

18   in the foregoing paragraphs as though set forth fully herein.

19        62. Plaintiffs are informed and believe, and thereon allege, that the written instruments

20   created, published and recorded by the Defendants herein, if left outstanding, will cause serious

21   injury to Plaintiffs and will be used vexatiously against them, for whom the written instruments are

22   not only voidable, but <u>void</u>.  Therefore, pursuant to the provisions of Cal. Civ. Code §3412,

23   Plaintiffs request this court to adjudge and order Defendants to deliver up the NOTE and DOT

24   executed by Plaintiffs (if indeed Defendants are able to do so) so that they may be canceled, or in the

25   alternative, to declare the NOTE and DOT to be without force and effect and further to instruct the

26   clerk of the Court to sign a Deed of Reconveyance so that the cloud on Plaintiffs' property may be

27   removed.

28        63. Plaintiffs are further informed and believe and thereon allege that under Civ. Code

§3413 for a Deed of Trust to be subject to a cause of action for cancellation, the instrument must appear to be valid.  At the time Plaintiffs executed the DOT and NOTE, said documents appeared to be valid as uniform instruments related to real property transactions. *See* **Exhibit "A".** Similarly the foreclosure documents described with particularity in Count III; specifically, the Corporate Assignment, the Substitution of Trustee, NOD and Notice of Trustee Sale appear on their face to be valid. *See* **Exhibits "B"-"E".**

64. Plaintiffs allege that the Defendant HSBC does not have any documents as required by statute to be recorded that shows any *effective* assignment of the DOT and NOTE to it and that none of the Defendants is a  real party in interest  having  standing to commence a foreclosure action against the Property.  In other words, none of the Defendants has enforceable rights against Plaintiffs' Property.

65. Defendant HSBC is not a valid beneficiary as MERS, the agent for WMC, had no authority to make the assignment to this Defendant because MERS had nothing to assign. WMC's beneficial interest in Plaintiffs' DOT was extinguished in 2005, when WMC sold Plaintiffs' loan without documenting the transaction.  Moreover, WMC did not even exist as a business entity in 2011 when the assignment was attempted.

66. As shown in Count III, the foreclosure documents; specifically, the Corporate Assignment of Deed of Trust and Substitution of Trustee, NOD and Notice of Trustee Sale executed by Defendants are fraudulent and violate California's non-judicial statute and penal law and ought to be cancelled.

**WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as hereinafter set forth.**

## COUNT V: <u>VIOLATION OF BUSINESS AND PROFESSIONS CODE, SECTION 17200, *et seq.*</u>
### (Against All Defendants)

67. Plaintiffs refer to and incorporate by this reference the allegations contained in the foregoing paragraphs as though set forth fully herein.

68. California Business and Professions Code §17200 et seq. prohibits acts of unfair

1   competition, which means and includes any "fraudulent business practice" and conduct which is

2   "likely to deceive" and is "fraudulent" within the meaning of §17200.

3            69. As more fully described above, the acts and practices of Defendants are likely to

4   deceive, constituting a fraudulent business act or practice. *See*, in particular, foregoing Counts I and

5   III. This conduct is ongoing and continues to this day.

6            70. Specifically, and as set forth with greater particularity in preceding paragraphs, the

7   named Defendants, and each of them, have engaged and are engaging in deceptive business

8   practices with respect to mortgage servicing, assignments of deeds of trust and the filing of

9   fraudulent foreclosure documents and related matters by, *inter alia*:

10           a.       Executing  false and misleading documents (MERS,   HSBC and their agents);

11           b.       Executing documents without the legal authority to do so (MERS,  HSBC and

12   their agents);

13           c.       Failing to disclose the principal for which documents were being executed in

14   violation of California Civil Code §1095 ( MERS and its agents );

15           d.       Acting as beneficiaries and trustees without the legal authority to do so (MERS,

16   HSBC and their agents);

17           e.       Failing to comply with California Civil Code  §§ 1668, 1708 and 1709 (All

18   defendants);

19           f.       Violating provisions of the non-judicial foreclosure statute set forth at California

20   Civil Code §§2934(a)(1)(A) ( HSBC and its agent Wells Fargo) and 2924(a)(1) (MERS, HSBC and

21   their agents); and 2932.5 (MERS and HSBC)

22           g.       Demanding and collecting mortgage payments without authority to do so (HSBC

23   through its agents WELLS FARGO and ASC);

24           h.       Engaging in criminal conduct under §115 and 532(f)(a) (4) of the California Penal

25   Code (all defendants); and

26           i.       Engaging in other deceptive practices, including those which may be uncovered

27   during the course of discovery.

28           71. Plaintiffs allege that the Defendants' misconduct, as alleged herein, gave, and has

1   given, Defendants, and each of them, an unfair competitive advantage over their competitors.  The

2   scheme implemented by Defendants, in collusion with one another, is specifically designed to

3   defraud California consumers and enrich Defendants at the expense of consumers in this State.

4        72. By reason of the foregoing, Defendants should be enjoined from continuing such

5   practices, pursuant to California Business & Professions Code §§17203 and 17204.  Plaintiff has

6   suffered injury in fact, including but not limited to, out-of-pocket payments made to a loan

7   modification assistance firm, fees for a forensic mortgage loan auditor, attorneys fees, mortgage

8   payments made to improper parties WELLS FARGO and ASC as agents for Defendant HSBC, who

9   had no authority to claim rights to such payments and other damages to be proved at trial.  Plaintiffs

10  will also suffer the loss of business income should they lose their Property in foreclosure. Plaintiffs'

11  creditworthiness has been significantly impaired as a result of the fraudulent assignment and

12  foreclosure documents executed by MERS, WELLS FARGO, HSBC and NORTHWEST as

13  explained with greater particularity in Count III. Plaintiffs have also suffered severe emotional

14  distress as a result of the foregoing damages and losses and because they are extremely worried

15  about what will happen to their elderly clients should their elder care facility close.  Undoubtedly,

16  other members of the public, similarly have fallen victim to Defendants' deceptive schemes, are

17  likely to be injured as well.

18       73. The harm to Plaintiffs and to members of the general public outweighs the utility (if

19  any) of Defendants' policies and practices. Consequently, their policies and practices constitute

20  unlawful business acts or practices within the meaning of Business & Professions Code §17200.

21  Moreover, the foregoing conduct promotes an incipient violation of a consumer law, or violates the

22  policy or spirit of such law or otherwise significantly threatens or harms competition.

23       74. Plaintiffs are therefore entitled to injunctive relief and attorney's fees as available

24  Under Business & Professions Code §17200 and related sections. The acts and practices described

25  in the foregoing paragraphs are unfair and violate the Business & Professions Code because they

26  constitute violations of all the statutes previously listed above.

27      **WHEREFORE, Plaintiffs pray for judgment against the Defendants as hereinafter set**

28  **forth.**

## COUNT VI: UNJUST ENRICHMENT
### (Against HSBC)

75. Plaintiffs refer to and incorporate by this reference the allegations contained in the foregoing paragraphs as though set forth fully herein.

76. Defendant HSBC, through its agents WELLS FARGO, the original servicer of Plaintiffs' mortgage loan, and ASC, the current servicer, claimed, and now claims rights to payments on Plaintiffs' loan. Plaintiff has in fact made payments to WELLS FARGO pursuant to, and in justified reliance upon, WELLS FARGO's claim of rights to such payments. As alleged hereinabove, Plaintiff's DOT and Note are void as the mutual assent required to form a contract was absent due to Defendants' fraudulent concealment of the undocumented sale of Plaintiffs' mortgage loan. Therefore, WELLS FARGO has no right to demand or collect mortgage payments from Plaintiffs.

77. Defendant ASC, current servicer of Plaintiffs' loan, claims rights to payments on Plaintiffs' mortgage loan on behalf of its principal, HSBC. Plaintiffs have made mortgage payments to ASC in justified reliance on ASC's claim of rights to the payments. ASC does not have rights to such payments for the same reasons its predecessor WELLS FARGO had no such rights. In addition, ASC, as the agent of HSBC, has no right to demand or collect mortgage payments from Plaintiffs because HSBC is not a valid beneficiary as explained with particularity in Count III. HSBC had knowledge of such circumstances giving rise to unjust enrichment at the time of claiming rights to payment from Plaintiffs on the loan. Defendant HSBC acquired a benefit at the expense of Plaintiffs without Plaintiffs' knowledge or consent.

78. Defendant HSBC has received a benefit from Plaintiffs for money had and received. It is unjust for Defendants to retain the benefit at the expense of Plaintiffs.

**WHEREFORE, Plaintiffs pray for judgment against the Defendants as hereinafter set forth.**

## COUNT VII:  SLANDER OF TITLE
### (Against All Defendants)

79. Plaintiffs refer to and incorporate by this reference the allegations contained in the

1   foregoing paragraphs as though set forth fully herein.

2      80. Defendants HSBC and MERS , without a privilege to do so (as there is no privilege

3   to publish knowingly false statements) authorized the Publication of the false and disparaging

4   statements in the assignment and foreclosure documents described with specificity in ¶¶16, 17, 20,

5   22 and 58, above, which are incorporated by reference in this Count VII. The illegal assignment

6   fraudulently purports to transfer all beneficial interest in Plaintiffs' DOT from MERS as nominee of

7   the defunct WMC to Defendant HSBC, as trustee of the MBS Trust. The statements in the NOD set

8   forth in ¶¶16, 17, 20, 22 and 58, above, fraudulently claim that HSBC is entitled to mortgage

9   payments and foreclosure fees and costs and is entitled to otherwise enforce the terms of Plaintiffs'

10  mortgage. In the Substitution of Trustee recorded by WELLS FARGO on behalf of HSBC, HSBC

11  fraudulently claims to be the beneficiary under Plaintiff's DOT with the power to substitute the

12  trustee thereunder. In the Notice of Trustee Sale issued by NORTHWEST, HSBC's agent falsely

13  claims to be the duly appointed trustee authorized to act on behalf of HSBC. But, as alleged in

14  foregoing cited paragraphs, NORTHWEST is not a valid trustee and HSBC, as trustee of the MBS

15  Trust, is not a valid beneficiary.

16     81. These false statements were made with malice and reckless disregard of the truth by

17  MERS, HSBC and their agents for the purpose of initiating and pursuing illegal foreclosure activity

18  against Plaintiffs and to extract mortgage payments from them without the authority to do so.

19     82. These false statements we published with malicious intent and without any

20  justification whatsoever. Therefore, they are not privileged.

21     83. The recording of the foregoing Corporate Assignment, the Substitution of Trustee,

22  Notice of Default and Notice of Trustee's Sale have cast a cloud on the title to Plaintiffs' property

23  rendering it inalienable as they allege that Defendants and their agents have no power to enforce the

24  power of sale in the DOT.

25     84. Plaintiffs have suffered direct pecuniary loss as they have made mortgage payments

26  to WELLS FARGO and ASC which had no authority to collect them on behalf of HSBC. Payment

27  to the wrong party has no effect on a borrower's mortgage obligations. Plaintiffs still owe the

28  payments to the party with standing to collect them. Plaintiffs have also wrongly been assessed

1  foreclosure fees and costs by Defendants.  In addition, Plaintiffs were required to pay the fees of

2  their forensic loan auditor and has paid attorney fees to uncover the fraudulent and illegal conduct of

3  the Defendants. Finally, Plaintiffs continue to pay fees to their loan modification assistance firm.

4      **WHEREFORE, Plaintiffs pray for judgment against the Defendants as hereinafter set**

5  **forth.**

6      **COUNT VIII: VIOLATION OF CA. CIVIL CODE SECTION 2932.5**

7      **( Against HSBC)**

8      85. Section 2932.5 of the California Civil Code provides as follows:

9      Where a power to sell real property is given to a mortgagee, or other

10     encumbrancer, in an instrument intended to secure the payment of money, the
        power is part of the security and vests in any person who by assignment becomes

11     entitled to payment of the money secured by the instrument. *The power of sale*
        *may be exercised by the assignee if the assignment is acknowledged and*

12     *recorded.* (Emphasis supplied.)

13     86. The requirements of Section 2932.5 apply equally to mortgages and deeds of trust. *In*

14  *Re Salazar*, 448 B.K.  814, 822.

15
        87. Defendant HSBC published its intention to exercise the power of sale in the DOT
16
    when it authorized the recordation of the May 11, 2011 Notice of Default and Election to Sell Under
17
18  Deed of Trust.  At the time the NOD was recorded no assignment to HSBC had been made.

19  Therefore, this Defendant had no power to issue the NOD or to exercise the power of sale.

20     88. HSBC and MERS tried to paper over the illegal NOD by recording a Corporate

21   Assignment of Plaintiffs' Deed of Trust on August 24, 2011- three months following recordation of

22   the illegal NOD.  The assignment was attempted by MERS on behalf of the original lender, WMC.
23
    The assignment is fraudulent for two reasons. First, WMC's beneficial interest in Plaintiffs' DOT
24
25  was extinguished in 2005 when it sold its interest in Plaintiffs' NOTE and DOT without

26  documentation to the MBS Trust for which HSBC serves as trustee.  Thus, WMC had no interest to

27  convey in 2011. Second, WMC ceased to exist as a business entity in 2007 and could not be

28  lawfully resurrected to make the assignment in 2011.

89. Defendants cannot have it both ways. If HSBC obtained a beneficial interest in Plaintiffs' DOT before the NOD was recorded on May 17, 2011, Defendants were required to record the transfer of that interest to HSBC contemporaneously with the transfer. Otherwise, it is unknown how anyone could confirm whether HSBC had the legal authority to dispossess Plaintiffs of their Property. The only evidence, albeit fraudulent, that HSBC acquired a beneficial interest in Plaintiffs' DOT is the Corporate Assignment of Deed of Trust recorded on August 24, 2011. As this assignment occurred three months after HSBC illegally authorized issuance of the NOD against Plaintiffs, all foreclosure activities which flow from the illegal NOD are null and void.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff prays for judgment against the Defendants and each of them as set forth below:**

1. For an order enjoining the October 11, 2012 trustee sale;

2. For an order temporarily restraining Defendants and each of them, their agents, representatives, successors and assigns, from initiating and pursuing foreclosure activity against the Plaintiffs relating to the Subject Property and a preliminary injunction restraining Defendants from same during the pendency of this litigation;

3. For an order forever enjoining the defendants, and each of them, their agents, representatives, successors and assigns, from initiating and pursuing foreclosure activity against Plaintiffs relating to the Subject Property;

4. For an order compelling said Defendants, and each of them, to transfer legal title and possession of the subject property to Plaintiff herein; for a finding and determination that Plaintiff is the rightful holder of the title to the property and that Defendants herein, and each of them, have no estate, right, title, lien or interest in said property;

5. For a judgment forever enjoining said Defendants, and each of them, from claiming any estate, right, title, lien or interest in the subject property;

6. For judgment holding that Pursuant to Business & Professions Code §17203, Defendants MERS and HSBC, their successors, agents and assigns, representatives, employees, and

all persons who act in concert with them, are permanently enjoined from committing all acts of unfair competition in violation of §17200 including, but not limited to, the violations identified in Count III of Plaintiffs' Complaint; that Plaintiffs are entitled to an award of statutory attorney's fees; that Plaintiffs are entitled to statutory damages; that Plaintiffs are entitled to the cost of suit; and any other relief the Court deems just and proper.

7.    For a judgment that not one of the Defendants has any unencumbered legal interest in both the NOTE and DOT;

8.    Plaintiff further prays that the court issue an Order and Decree canceling the NOTE, DOT, NOD, Corporate Assignment of DOT, Substitution of Trustee and Notice of Trustee Sale finding same void as to Plaintiff and that the court instruct the clerk to execute a full deed of reconveyance of the DOT in favor of Plaintiff.

9.    For a finding that Defendant HSBC has no rights to payments made to WELLS FARGO and ASC and has been unjustly enriched in an amount according to proof and that the same, with interest at the legal rate, shall be reimbursed to Plaintiffs.

10.   For general, consequential and special damages according to proof;

11.   For punitive damages in an amount sufficient to deter the fraudulent conduct set forth with particularity in Court III of this Verified Complaint in the future;

12. For costs of suit herein; and

13. For such other and further relief as the court deems just and proper.

BUSINESS AFFAIRS CONSULTANTS, INC.

Dated: October 4, 2012

By:    /s/ Christopher P. Epsha
Christopher P. Epsha
Attorney for Plaintiffs

1    I, Ernesto S. Puruganan, declare as follows:

2    I am a Plaintiff in this action, and I hereby declare that I have read the foregoing Verified

3    Complaint and know the contents thereof. I believe that the matters stated therein are true of my own

4    knowledge, except as to those matters which are therein alleged on information and belief, and as to

5    those matters, I believe them to be true.

6

7    I hereby declare under the penalty of perjury, that the foregoing is true and correct.  This

8    Verification was executed this 5th day of September, 2012 in Walnut Creek, California.

9

10                                              _____

11                                              Ernesto S. Puruganan

12

13   I, Isabelita Puruganan, declare as follows:

14   I am a Plaintiff in this action, and I hereby declare that I have read the foregoing Verified

15   Complaint and know the contents thereof. I believe that the matters stated therein are true of my own

16   knowledge, except as to those matters which are therein alleged on information and belief, and as to

17   those matters, I believe them to be true.

18

19   I hereby declare under the penalty of perjury, that the foregoing is true and correct.  This

20   Verification was executed this 5th day of September, 2012 in Walnut Creek, California.

21

22

23                                              _____

24                                              Isabelita Puruganan

25

26

27

28

Puruganan v. America's Servicing Company              Verification of complaint                    2

EXHIBIT A

17

RECORDING REQUESTED BY:
ALLIANCE TITLE COMPANY

RECORDING REQUESTED BY /
RETURN TO:
WMC MORTGAGE CORP.

3100 THORNTON AVENUE

BURBANK, CA 91504

Attn: (WHOLESALE)

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2005-0313410-00

Acct 15- Alliance Title Company
Friday, AUG 19, 2005 08:00:00
MIC     $1.00:MOD    $17.00:REC    $21.00
                     $1.00:REF     $0.20
TCF    $16.00:DAF
Ttl Pd  $57.00          Nbr-0002855770
                              rrc/R2/1-17

Prepared By:
GREEN QUINCY

WMC MORTGAGE CORP.

6320 CANOGA AVENUE 10TH FL
(MAILROOM)

WOODLAND HILLS, CA 91367

Ex# 11363742-507-SG [Space Above This Line For Recording Data]

SERV #: 11284652          **DEED OF TRUST**

PURUGANAN
Loan #: 11284652
MIN: 100136300112846521
PIN: 170-260-028

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
**(A) "Security Instrument"** means this document, which is dated     August 10, 2005                    together with all Riders to this document.
**(B) "Borrower"** is  ISABELITA G. PURUGANAN AND ERNESTO Ø PURUGANAN, WIFE AND HUSBAND AS JOINT TENANTS.          S. Ø

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  WMC MORTGAGE CORP.

Lender is a  Corporation                                        organized and existing under the laws of
CALIFORNIA                          . Lender's address is  P.O. BOX 54089 LOS ANGELES,
CA 90054-0089
**(D) "Trustee"** is  WESTWOOD ASSOCIATES, A CALIFORNIA CORPORATION
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888)679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated  August 10, 2005
The Note states that Borrower owes Lender
Seven Hundred Thirty-Six Thousand And 00/100
Dollars (U.S. $ 736,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  September 1, 2035

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01
DOCUKCA1                          *(Page 1 of 13)*
DOCUKCA1.VTX 09/15/2004

313410

11284652                                                    11284652

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Other(s) [specify]

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.
As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                of      CONTRA COSTA
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AND KNOWN AS
EXHIBIT 'A'.

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01
DOCUKCA2                                  *(Page 2 of 13)*
DOCUKCA2.VTX 09/15/2004

313410

11284652                                          11284652

which currently has the address of   1832 SUNNYVALE AVENUE
                                           [Street]
**WALNUT CREEK**                   , California   94597        ("Property Address"):
        [City]                          [State]    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from

**CALIFORNIA** – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**            Form 3005 1/01
DOCUKCA3                                    *(Page 3 of 13)*
DOCUKCA3.VTX 09/15/2004

313410

11284652                                                    11284652

Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full repayment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

313410

11284652                                                          11284652

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3005 1/01
DOCUKCA5                                          (Page 5 of 13)
DOCUKCA5.VTX 09/15/2004

313410

11284652                                                11284652

Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

11284652                                    11284652                         313410

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender. If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such

313410

11284652                                    11284652

Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

11284652                                    11284652                                    313410

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

313410

11284652                                           11284652

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument 'and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law,

**CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    **Form 3005 1/01**
DOCUKCA10                                 *(Page 10 of 13)*
DOCUKCAA.VTX 09/15/2004

313410

11284652                                          11284652

(b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                          Form 3005 1/01
DOCUKCA11                                    *(Page 11 of 13)*
DOCUKCAB.VTX 09/15/2004

313410

11284652                                                11284652

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____  08/13/05
- Borrower - ERNESTO G PURUGANAN - Date -

_____  8/13/05
- Borrower - ISABELITA G PURUGANAN - Date -

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3005 1/01
DOCUKCA12                                            *(Page 12 of 13)*
DOCUKCAC.VTX 09/15/2004

313410

11284652                                                                    11284652

[Space Below This Line for Acknowledgment]

State of *CALIFORNIA*
County of *CONTRA COSTA*

On *AUGUST 13, 2005*                          , before me, *Steve Guest*
personally appeared

*ISABELITA G. PURUGANAN AND ERNESTO S. PURUGANAN*

~~personally known to~~ me (or proved to me on the basis of satisfactory evidence) to be the person(s), whose
name(s) *ARE*          subscribed to the within instrument and acknowledged to me that *They*
executed the same in *their*      authorized capacity(ies), and that by *their*      signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

> STEVE GUEST
> Commission # 1404828
> Notary Public - California
> Contra Costa County
> My Comm. Expires Mar 10, 2007

My Commission Expires: *March 10, 2007*

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3005 1/01
DOCUKCA13                                          *(Page 13 of 13)*
DOCUKCAD.VTX 09/15/2004

File No. 11363742-507- SG 313410

# LEGAL DESCRIPTION

All that certain real property in the City of Walnut Creek, County of Contra Costa, State of California, described as follows:

A portion of Lot 15 as delineated upon that certain map entitled "Map of the Hook Estate, Subdivision No. 1", Contra Costa County, California; filed April 18, 1914, in Map Book 11, page 255, in the Office of the County Recorder of the County of Contra Costa, State of California, described as follows:

Commencing at the southwest corner of Lot 15; thence running along westerly line of Lot 15, north 0° 09' 30" west 428.27 feet to the northerly line of 15; thence along the northerly line of said Lot, north 89° 30' east 101.76 feet to a point on said lot line; thence leaving said lot line crossing said Lot 15, south 0° 09' 30" east 428.27 feet to the southerly line of Lot 15; thence along said southerly lot line south 89° 30' west 101.76 feet to the southwest corner of Lot 15 and to the point of commencement.

EXCEPTING THEREFROM:

The parcel of land described as Parcel One in the Deed from D. Baca to D.E. Baca, recorded August 6, 1964, Book 4676, OR, Page 463.

ALSO EXCEPTING THEREFROM:

The parcel of land described as Parcel One in the Deed from D. Baca to J.A. Baca, recorded May 3, 1966, Book 5112, OR, Page 307.

APN No:   170-260-028

313410

## ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

PURUGANAN
Loan #: 11284652
MIN:    100136300112846521

Serv #: 11284652

THIS ADJUSTABLE RATE RIDER is made this 10th      day of   August, 2005                    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to
Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the
Borrower's Note to   WMC MORTGAGE CORP.

(the "Lender") of the same date and covering the
property described in the Security Instrument and located at:
1832 SUNNYVALE AVENUE, WALNUT CREEK, CA 94597

[Property Address]

> THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
> INTEREST RATE AND MY MONTHLY PAYMENT. THE NOTE LIMITS THE
> AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
> MAXIMUM RATE I MUST PAY.
>
> DURING THE FIRST Five                  ( 5  ) YEARS, INTEREST ONLY
> PAYMENTS WILL BE REQUIRED TO BE MADE.  THIS MEANS THAT THE
> REGULAR MONTHLY PAYMENT WILL NOT REDUCE THE AMOUNT I OWE
> DURING THE FIRST Five              ( 5   ) YEARS OF MY LOAN.
> YOUR INTEREST RATE MAY CHANGE DURING THE 'INTEREST ONLY
> PERIOD' EVERY 6 MONTHS BEGINNING AFTER THE FIRST CHANGE DATE
> AS DESCRIBED IN SECTION 4 OF THE NOTE.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of  6.275     %. The Note provides for changes in the interest rate
and the monthly payments, as follows:

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of  September, 2007        and
on that day every 6th       month thereafter. Each date on which my interest rate could change is called
a "Change Date."

DOCUNSG1
DOCUNSG1.VTX 07/09/2004                           *(page 1 of 3 pages)*

313410

11284652                                                              11284652

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six** percentage point(s) ( **6.000** %) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the first **Five** ( **5** ) years after loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest only on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the "interest-only period" unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the "interest-only period," my payment amount for subsequent payments during the "interest-only period" will be reduced to the amount necessary to pay interest at the then current interest rate on the remaining unpaid principal balance.

At the end of the "interest-only period" and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I will owe at that Change Date in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the "interest-only period," my payment amount will not be adjusted due to voluntary principal payments until the next Change Date.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **9.275** % or less than **6.275** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **12.775** % or less than **6.275** %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred)

313410

11284652                                                      11284652

without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

   If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ 08/13/05
- Borrower - ERNESTO G PURUGANAN - Date -

_____ 8/13/05
- Borrower - ISABELITA G PURUGANAN - Date -

**END OF DOCUMENT**

EXHIBIT B

EXHIBIT B

3

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
**DOC- 2011-0099283-00**

Recording requested by:

Check Number
Tuesday, MAY 17, 2011 15:34:00

| | | | | |
|---|---|---|---|---|
| MOD | $3.00 | REC | $13.00 | FTC | $2.00 |
| DAF | $2.70 | REF | $0.30 | RED | $1.00 |
| ERD | $1.00 | | | |

When recorded mail to:
NORTHWEST TRUSTEE SERVICES, INC.
1241 E. Dyer Road, Suite 250
Santa Ana, CA 92705
APN 170-260-028-7

Ttl Pd   $23.00       Nbr-0000918628
lrc/RR/1-3

Space above this line for Recorder's use

File No. 7777.16230
Property: 1832 SUNNYVALE AVE
WALNUT CREEK, CA 94597

MIN No. 100136300112846521

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION.

You may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account (normally five business days prior to the date set for the sale of your property). No sale may be set until three months from the date this notice of default is recorded (which date of recordation appears on this notice). This amount is **$43,634.20** as of **05/17/11**, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

HSBC Bank USA, National Association. as Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2005-HE7, Asset-Backed Pass-Through Certificates
**C/O Northwest Trustee Services, Inc.**
**1241 E. Dyer Road, Suite 250 Santa Ana, CA 92705**
**Telephone (714) 277-4888**

**Reinstatement and Pay-Off Request Line (866) 387-NWTS**

TS No.: 7777.16230
Notice of Default and Election to Sell Under Deed of Trust

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That the undersigned is either the original Trustee, the duly appointed substituted trustee or acting as agent for the trustee or beneficiary under a Deed of Trust dated 08/10/05, executed by **ISABELITA G. PURUGANAN AND ERNESTO S. PURUGANAN, WIFE AND HUSBAND AS JOINT TENANTS,** as Trustor(s), to secure certain obligations in favor of **Mortgage Electronic Registration Systems, Inc., solely as a nominee for WMC Mortgage Corp,** as Beneficiary, recorded 08/19/05, as Instrument No. **2005-0313410,** of Official Records in the Office of the Recorder of **CONTRA COSTA** County, California, describing land therein as more fully described in said Deed of Trust. 170-260-028-7

Said obligations including (1) NOTE(S) FOR THE ORIGINAL sum of **$736,000.00,** that the beneficial interest under such Deed of trust and the obligation secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:
The monthly installment of principal and interest which became due on **10/01/10,** and all subsequent installments, together with late charges as set forth in said Note and Deed of Trust, advances, assessments and attorney fees. Nothing in this notice shall be construed as a waiver of any fees owing to the beneficiary under the deed of trust, pursuant to the terms of the loan documents

A copy of CA Civil Code Section §2923.5(b) declaration is attached hereto and incorporated herein by reference.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Dated: 05/17/11      **Northwest Trustee Services, Inc.**
**As Agent For Beneficiary**
**By: LSI Title Company, as Agent**

                               **Aristio Singson**

By: _____

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

7777.16230

# NOTICE OF DEFAULT DECLARATION
## PURSUANT TO CALIFORNIA CIVIL CODE 2923.5

America's Servicing Company
3476 Stateview Blvd.
Fort Mill, SC 29715

Borrower: ERNESTO S PURUGANAN
Property Address:   1832 SUNNYVALE AVE
                     WALNUT CREEK         CA   94597

The undersigned mortgagee, beneficiary, or their authorized agent (collectively, the "Beneficiary") represent and declares that the requirements of CA Civil Code 2923.5 have been met. This Declaration is required for any residential owner occupied property in which the loan was originated between January 1, 2003 and December 31, 2007. Non-owner occupied and vacant properties are exempt from the requirements of CA Civil Code 2923.5.

The requirement indicated by "X" was met by the Beneficiary:

*    The Beneficiary has made contact with the borrower pursuant to CA Civil Code 2923(a)(2). Contact with the borrower was made in person or by telephone to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.

X    Due Diligence to contact the borrower was exercised pursuant to CA Civil Code 2923.5(g)(2) by the Beneficiary.

*    The borrower has surrendered the property as evidenced by either a letter confirming the surrender or delivery of the keys to the property to the mortgagee, Trustee, beneficiary, or authorized agent pursuant to CA Civil Code 2923.5(h)(1).

*    The borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and avoid their contractual obligations to mortgagees or beneficiaries pursuant to CA Civil Code 2923.5(h)(2).

*    The borrower has filed for bankruptcy and the proceedings have not been finalized pursuant to CA Civil Code 2923.5(h)(3).

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:   05/06/2011 _____         _Derrick Green_ _____
                                       America's Servicing Company

                                       Derrick Green _____
                                        VP of Loan Documentation

END OF DOCUMENT

EXHIBIT C



**EXHIBIT C**

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:

DEFAULT ASSIGNMENT
WELLS FARGO BANK, N.A.
MAC: X9999-018
PO BOX 1629
MINNEAPOLIS, MN  55440-9790

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2011-0173363-00

Check Number
Wednesday, AUG 24, 2011 14:40:43
MOD    $2.00:REC    $12.00:FTC    $1.00
DAF    $2.70:REF    $0.30:RED    $1.00
ERD    $1.00:

Ttl Pd    $20.00    Rcpt # 0001007029
MNU/R5/1-2

---

### CORPORATE ASSIGNMENT OF DEED OF TRUST

Contra Costa, California
SELLER'S SERVICING #:1158017107 "PURUGANAN"

MERS #: 100136300112846521 SIS #: 1-888-679-6377

Prepared By:  Emily Hoover,  WELLS FARGO BANK, N.A. 1000 BLUE GENTIAN RD., EAGAN, MN  55121 (651)605-3792

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WMC MORTGAGE CORP., ITS SUCCESSORS AND ASSIGNS hereby grants, assigns and tranfers to HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2005-HE7, ASSET BACKED PASS-THROUGH CERTIFICATES at 636 GRAND REGENCY BLVD., BRANDON, FL 33510 all beneficial interest under that certain Deed of Trust dated 08/10/2005 , in the amount of $736,000.00, executed by ISABELITA G. PURUGANAN AND ERNESTO S. PURUGANAN, WIFE AND HUSBAND AS JOINT TENANTS. to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WMC MORTGAGE CORP., ITS SUCCESSORS AND ASSIGNS and Recorded:  08/19/2005  as Instrument No.: 2005-0313410-00 in the County of Contra Costa, State of California.

 Therein described or referred to, in said Deed of Trust, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

In witness whereof this instrument is executed.

  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WMC MORTGAGE CORP., ITS SUCCESSORS AND ASSIGNS
On ___8/22/11___

_____ , Assistant
YEN NGUYEN
Secretary

---

*EH*EHWFEM*08/22/2011 10:05:13 AM* WFEM01WFEMA0000000000000000002691* CACONTR* 1158017107 CASTATE_TRUST_ASSIGN_ASSN **EHWFEM*

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

STATE OF Minnesota
COUNTY OF Dakota

On _8/22/2011_, before me, _Robert W. Caruso_, a Notary Public in and for Dakota in the State of Minnesota, personally appeared _YEN NGUYEN_, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_[signature]_
Notary Expires: _1/31/2014_

> ROBERT W. CARUSO
> NOTARY PUBLIC
> MINNESOTA
> My Commission Expires Jan. 31, 2014

(This area for notarial seal)

*EH*EHWFEM*08/22/2011 10:05:13 AM* WFEM01WFEMA00000000000000000002691* CACONTR* 115801710*CACACA*CACACACACACACACA*EHWFEM*

**END OF DOCUMENT**

EXHIBIT D

EXHIBIT D

Recording requested by:

When recorded mail to:
Northwest Trustee Services, Inc.
1241 E. Dyer Road, Suite 250
Santa Ana, CA 92705

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
**DOC- 2011-0228559-00**

Check Number
Monday, OCT 24, 2011 11:30:00
MOD    $2.00:REC   $12.00:FTC    $1.00
DAF    $2.70:REF   $0.30:RED    $1.00
ERD    $1.00:
Ttl Pd   $20.00        Rcpt # 0001070329
                              rrc/RJ/1-2

File No. 7777.16230          Title Order No. 110240652

## SUBSTITUTION OF TRUSTEE

WHEREAS, **Westwood Associates, A California Corporation** was the original Trustee under that certain Deed of Trust dated 08/10/2005, executed by ISABELITA G. PURUGANAN AND ERNESTO S. PURUGANAN, WIFE AND HUSBAND AS JOINT TENANTS to secure certain obligations in favor of **Mortgage Electronic Registration Systems, Inc., solely as a nominee for WMC Mortgage Corp**, as Beneficiary, recorded 08/19/2005, as Instrument No.2005-0313410, of Official Records in the Office of the Recorder of **CONTRA COSTA** County, California and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires, to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

NOW THEREFORE, the undersigned hereby substitutes **Northwest Trustee Services, Inc.**, whose address is: **1241 E. Dyer Road, Suite 250, Santa Ana, CA 92705**, as Trustee under said Deed of Trust.

**Wells Fargo Bank, N.A., as servicing agent for HSBC Bank USA, National Association, as Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2005-HE7, Asset Backed Pass-Through Certificates**

By: Melissa Gallio, Vice President Loan Documentation     10/5/11

State of California
County of ORANGE

On OCTOBER 5, 2011 before me, S. MWAYI Notary Public, personally appeared MELISSA GALLIO , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____                    
Notary Public Signature                     Notary Public Seal

S. MWAYI
COMM #1866861
Notary Public-California
ORANGE COUNTY
My Comm. Exp. OCT 2, 2013

## AFFIDAVIT OF MAILING
## FOR SUBSTITUTION OF TRUSTEE BY CODE

File No. 7777.16230

I, Melissa Myers, declare:   That I am an employee of Northwest Trustee Services, Inc., whose business address is:

      1241 E. Dyer Road, Suite 250
      Santa Ana, CA 92705

I am over the age of eighteen years and a copy of the attached Substitution of Trustee was mailed, prior to the recording thereof and in the manner provided in §2924b of the Civil Code of the State of California, to all persons to whom a copy of the Notice of Default was required to be mailed by the provisions of said section.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 21, 2011

               _____
               Melissa Myers, Signature of Affiant

END OF DOCUMENT

EXHIBIT E

**EXHIBIT E**



CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
**DOC— 2011-0228560-00**
Check Number
Monday, OCT 24, 2011 11:30:00
MOD    $1.00:REC    $11.00:FTC    $0.00
DAF    $2.70:REF    $0.30:RED    $1.00
ERD    $1.00:           :

Ttl Pd    $17.00    Rcpt # 0001070330
                              rrc/RJ/1-1

Space above this line for recorder's use only

Recording requested by:

When recorded mail to:
**NORTHWEST TRUSTEE SERVICES, INC.**
1241 E. Dyer Road, Suite 250
Santa Ana, CA 92705

---

File No. 7777.16230          Title Order No. 110240652          MIN No. 100136300112846521
APN 170-260-028-7

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED 08/10/05. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in §5102 to the Financial code and authorized to do business in this state, will be held by duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.

Trustor(s): **ISABELITA G. PURUGANAN AND ERNESTO S. PURUGANAN, WIFE AND HUSBAND AS JOINT TENANTS**
Recorded: **08/19/05**, as Instrument No. **2005-0313410**,of Official Records of **CONTRA COSTA** County, California.
Date of Sale:   **11/18/11 at 1:30 PM**
Place of Sale: **At the Court Street entrance to the County Courthouse, 725 Court Street., Martinez, CA**
The purported property address is: **1832 SUNNYVALE AVE, WALNUT CREEK, CA 94597**
Assessors Parcel No. **170-260-028-7**
The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is **$795,579.86.**
If the sale is set aside for any reason, the purchaser at the sale shall be entitled only to a return of the deposit paid, plus interest. The purchaser shall have no further recourse against the beneficiary, the Trustor or the trustee.

Date: October 21, 2011          **NORTHWEST TRUSTEE SERVICES, INC., as Trustee**

Melissa Myers, Authorized Signatory
1241 E. Dyer Road, Suite 250, Santa Ana, CA 92705

Sale Info website: www.USA-Foreclosure.com or www.Auction.com
Automated Sales Line: 714-277-4845 or 800-280-2832
Reinstatement and Pay-Off Requests:  (866) 387-NWTS

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE